# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| SNEEZE WHEEZE & ITCH ASSOCIATES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.    09-cv-1190 |
| DYNAVAX TECHNOLOGIES CORPORATION, CRN/ALLERGY AND RESPIRATORY LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

# O R D E R   &   O P I N I O N

This matter is before the Court on both Defendants' Motions to Dismiss the counts of Plaintiff's Complaint that pertain to them.  (Docs. 3 & 5).  Plaintiff has responded in opposition to both of the Motions to Dismiss.  For the reasons stated below, Defendant Dynavax Technologies Corporation's Motion to Dismiss is denied, and Defendant CRN/Allergy and Respiratory LLC's Motion to Dismiss is denied.

## BACKGROUND

The essential background facts of this case are drawn from Plaintiff's Complaint and attached supporting documentation, and the Court draws all reasonable inferences in Plaintiff's favor.[1]  Plaintiff Sneeze, Wheeze & Itch Associates ("Plaintiff" or "SWI") is a clinical drug trial facility in Normal, Illinois that performs studies of new drugs.  As such, it enrolls study participants,

---

[1]    Though both Motions to Dismiss are brought under distinct parts of Federal Rule of Civil Procedure 12(b), each is subject to the requirement that the Court draw all reasonable inferences in Plaintiff's favor.

administers medications or placebos as directed by the study, and monitors the study participants. Between January 13, 2003 and July 6, 2007, SWI was a member of Defendant CRN/Allergy and Respiratory ("CRN"), which was formed in order to contract with sponsors of clinical research studies for the performance of such studies by the principal investigators affiliated with its members, and to market these services. This relationship between SWI and CRN is memorialized in the January 13, 2003 Participation Agreement. (Doc. 1, Ex. 1). This Participation Agreement establishes CRN as SWI's agent for, inter alia, contracting with study sponsors, and marketing SWI's services to sponsors. (Doc. 1, Ex. 1 at 2).

Defendant Dynavax Technologies Corporation ("Dynavax") is a sponsor of clinical drug trials. On March 31, 2005, Dynavax and CRN entered into a Clinical Study Agreement. (Doc. 1, Ex. 2). This agreement pertained to the trial of a drug intended to treat ragweed allergy in children, DV1-SAR-08 ("08 study"). CRN agreed to recruit twelve clinical trial sites and principal investigators for this study, to enroll eligible children in the study, to negotiate the budget for the trial, and to pay the principal investigators to perform the study. Dynavax was to pay CRN up to $20,000 per study participant, and provided a detailed protocol for the study. With the assistance of Dr. Anjuli Nayak, one of the two owners of SWI, a budget for the study was created and approved by all parties.

A copy of the protocol and budget for the 08 study were provided to SWI prior to April 12, 2005. On April 7, 2005, Dynavax acknowledged to SWI that SWI would serve as a trial site for the study, and offered indemnification to Dr. Nicholas Nayak, the other owner of SWI and the principal investigator of the 08 study, for

his participation in the study. (Doc. 1, Ex. 3). On April 12, 2005, CRN and SWI executed an agreement memorializing SWI's service as a trial site for the 08 study, and under which both Drs. Nayak were made principal investigators for the study ("2005 agreement"). (Doc. 1, Ex. 4). Under this agreement, CRN agreed to pay $18,920 per study participant and up to $15,000 in start-up and advertising costs; the 2005 Agreement noted that the Participation Agreement had established CRN as SWI's agent for contracting with Dynavax. On March 23, 2006, Dynavax and CRN entered into an amended Clinical Study Agreement. (Doc. 1, Ex. 5). Dr. Anjuli Nayak negotiated the terms of the amended Clinical Study Agreement for CRN. SWI performed all its obligations under the 2005 agreement between itself and CRN, and all of its obligations under the amended Clinical Study Agreement for the 08 study.

On December 20, 2005, Dynavax and CRN entered in another Clinical Study Agreement, pertaining to the trial of DV1-SAR-09; this trial was for a medication for ragweed-allergic adults ("09 study"). (Doc. 1, Ex. 6). Under this second Clinical Study Agreement, CRN agreed to contract with up to forty clinical research sites and to enroll eligible adults for the study. Dynavax agreed to make payments to CRN for the services provided by the study sites and principal investigators, up to $18,515 per study participant. CRN agreed to invoice Dynavax monthly, and Dynavax agreed to make payment within 30 days of receiving the invoice. Dynavax provided a detailed protocol for the study to CRN. With the assistance of Dr. Anjuli Nayak, a budget for the 09 study was created and approved by all of the parties, and the budget and protocol were provided to SWI prior to January 24, 2006.

On January 24, 2006, CRN and SWI executed an agreement that SWI would serve as a clinical research site for the 09 study, and both Drs. Nayak were made principal investigators for the study ("2006 agreement"). (Doc. 1, Ex. 7). Under this agreement, CRN agreed to pay SWI up to $17,290 per study participant and to pay certain start-up and chart review costs, up to $10,000; the agreement recited that, under the Participation Agreement, SWI had appointed CRN as its agent to contract with Dynavax. On March 23, 2006, Dynavax and CRN executed an amended Clinical Study Agreement for the 09 study, which was negotiated on CRN's behalf by Dr. Anjuli Nayak. (Doc. 1, 8). On April 7, 2006, Dynavax acknowledged to SWI that SWI would serve as a trial site for the study, and offered indemnification to Dr. Nicholas Nayak for his participation in the study. (Doc. 1, Ex. 9). On April 13, 2006, the amended Clinical Study Agreement for the 09 study was provided to SWI; it did not reduce the total payment per patient to SWI, but changed certain protocol requirements. SWI performed all its obligations under the 2006 agreement between itself and CRN, and all of its obligations under the amended Clinical Study Agreement for the 09 study.

On February 23, 2007, Dynavax sent an email to the investigators for the 08 and 09 studies, which advised them that Dynavax was terminating both studies early. (Doc. 1, Ex. 10). SWI performed reconciliations for the 08 and 09 studies, and found that SWI was owed $71,857 for the 08 study and $273,129 for the 09 study; SWI tendered these reconciliations to CRN and Dynavax. On March 12, 2007, Dynavax informed SWI that it would not make payment based on the reconciliations. (Doc. 1, Ex. 12).

On May 27, 2009, SWI filed suit against Dynavax and CRN. Counts I and II allege, respectively, breaches of the 08 and 09 Clinical Study Agreements between Dynavax and CRN by Dynavax, with SWI suing as a third-party beneficiary to those contracts. Counts III and IV allege, respectively, breaches of the 2005 and 2006 agreements between SWI and CRN.

## DYNAVAX'S MOTION TO DISMISS

Dynavax argues that its Motion to Dismiss should be granted on either of two grounds: the Court lacks personal jurisdiction over Dynavax, and the Court lacks subject-matter jurisdiction over this matter because Plaintiff does not have standing to bring this suit. The Court granted Dynavax leave to file a Reply brief in support of its Motion to Dismiss. (10/02/09 Text Order). The Court finds that neither ground requires dismissal of the counts against Dynavax.

## I.      Personal Jurisdiction

Dynavax moves to dismiss Counts I and II of Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(2), arguing that this Court lacks personal jurisdiction over it. This Court has personal jurisdiction over a defendant if the courts of Illinois would have personal jurisdiction over it. *Citadel Group Ltd. v. Washington Regional Medical Center*, 536 F.3d 757, 760 (7th Cir. 2008) (*citing RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997)). As Dynavax points out, the two-step process for determining whether Illinois would have personal jurisdiction, application of the Illinois long-arm statute and analysis of whether due process is satisfied under the Illinois and United States Constitutions, has effectively collapsed into a single analysis, since Illinois' long-arm statute now

reaches as far as permitted by the United States Constitution, and as "no case has yet emerged where due process was satisfied under the federal constitution but not under the Illinois constitution." *Id*. at 761 (*citing Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002); *RAR*, 107 F.3d at 1276; *Sabados v. Planned Parenthood of Greater Indiana*, 882 N.E.2d 121, 125 & fn. 2 (Ill. App. Ct. 2007)).

In ruling on a Motion to Dismiss under Rule 12(b)(2), the court "may receive and weigh affidavits prior to trial on the merits." *Nelson by Carson v. Park Industries, Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983) (*citing O'Hare International Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir. 1971). Though the plaintiff has the burden of proof, if the court decides the personal jurisdiction issue on the basis of written materials, this "burden of proof is met by a prima facie showing that personal jurisdiction is conferred," and the court must resolve all factual disputes in the record in the plaintiff's favor. *Id*. (*citing O'Hare International Bank*, 437 F.2d at 1176; *Neiman v. Rudolf Wolff & Co.*, 619 F.2d 1189, 1190 (7th Cir. 1980)). In addition, the Court draws "every inference" in the plaintiff's favor. *Central States, Southeast and Southwest Areas Pension Fund v. Phencorp*, 440 F.3d 870, 878 (7th Cir. 2006).

Dynavax argues that it is not subject to either general or specific jurisdiction in Illinois. (Doc. 4 at 5-8). Plaintiff concedes that Illinois does not have general jurisdiction over Dynavax, but argues that specific jurisdiction is appropriate in this claim for breach of the 08 and 09 Clinical Study Agreements between Dynavax and

CRN.[2] (Doc. 10 at 4-8). Unlike general jurisdiction, which permits jurisdiction for claims not "arising out of or related to the defendant's contacts with the forum" and is appropriate where the defendant's contacts with the forum are "continuous and systematic," specific jurisdiction applies where the "suit arises out of or is related to the defendant's contacts with the forum." *Citadel Group Ltd.*, 536 F.3d at 760 fn. 3 (*quoting Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 514 & fn. 9 (1984)).

Due process requires that, for a state to exercise specific jurisdiction over a defendant, the defendant must have "certain minimum contacts" with the state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The defendant must "purposefully avail itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (*quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Further, the defendant's connections with the state must be such that it should "reasonably anticipate being haled into court there." *Id.* at 474-75 (*quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The overall inquiry focuses on whether it was foreseeable to the defendant that it could be sued

---

[2] As is discussed further below, Plaintiff claims that it is an intended third-party beneficiary to these contracts between CRN and Dynavax, such that it has standing to enforce the contracts; the Court finds the Plaintiff has sufficiently alleged its status as an intended third-party beneficiary to defeat the Motion to Dismiss and proceed to discovery on the issue.

in the state. *Valley Air Service, Inc. v. Southaire, Inc.*, 06-c-782, 2006 WL 3743130, *3-4 (N.D. Ill. Dec. 15, 2006) (*citing Burger King*, 471 U.S. at 472-74).

The parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are relevant in determining whether the defendant's contacts are sufficient to exercise personal jurisdiction. *Id*. at 479. The Seventh Circuit has held that these "prior negotiations and contemplated future consequences" must "bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract." *RAR*, 107 F.3d at 1278. However, the past course of dealing is still relevant where there is a "continuing relationship" between them that is similar enough to the instant case that the prior transactions shed light on the transactions at issue. *Id*. at 1279 (*citing Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276 (7th Cir. 1990).

Dynavax has a number of contacts with Illinois relating to the 08 and 09 studies, which show that it purposefully availed itself of the benefits of conducting business in Illinois. First, though Dynavax points out that an Illinois party to a contract is not alone sufficient to confer personal jurisdiction on Illinois, it is not irrelevant. The fact that Dynavax made this contract through Plaintiff's agent, CRN, does not change this, since the affidavit from Dr. Anjuli Nayak and the Complaint raise the reasonable inference that Dynavax knew that Plaintiff would conduct the 08 and 09 studies for it.[3] *See Valley Air Service*, 2006 WL 3743130, *3.

---

[3]     As discussed further below in relation to Dynavax's standing argument, Plaintiff was a member of CRN at the time of the 08 and 09 Clinical Study Agreements, and, according to the Participation Agreement and the 2005 and 2006

Indeed, it appears from the terms of the Clinical Study Agreement between CRN and Dynavax that Dynavax contracted with CRN *because* CRN has access to its group of study sites. (Doc. 1, Ex. 6 at 1; Doc. 1, Ex. 2 at 1). In arranging a contract under which it knew that a significant portion of Dynavax's business would be conducted in Illinois, by an Illinois business, on Illinois residents, Dynavax "purposefully availed" itself of the benefits of Illinois.[4]

Further, not only did Dynavax know at the time of its initial execution of each of the Clinical Study Agreements that Plaintiff would be among the sites used by CRN, it offered indemnification to one of Plaintiff's principal investigators and engaged in budgeting and negotiations over amendments to the Clinical Study Agreements with the other after each of the original contracts were executed. (Doc. 1 at 3-4, 6; Doc. 1, Exs. 3 & 9; Doc. 10, Ex. 1, ¶¶ 20). Dynavax also sent its own auditor to Plaintiff's site in order to monitor the conduct of the 09 study, and sent auditors on its behalf every four to six weeks during both of the 08 and 09 studies. (Doc. 10, Ex. 1, ¶¶ 21-23). Indeed, these auditing visits were required by the

Agreements, CRN was Plaintiff's agent for purposes of dealing with Dynavax and other study sponsors. The Clinical Study Agreements state that none of the parties were the agents of the others, but, as all reasonable inferences must be drawn in Plaintiff's favor at this point, the fact that the other documents indicate an agency relationship is controlling. (Doc. 1 at 10; Doc. 1, Ex. 1 at 2; Doc. 1, Ex. 2 at 6; Doc. 1, Ex. 4 at 1; Doc. 1, Ex. 6 at 6; Doc. 1, Ex. 7 at 1; Doc. 10, Ex. 1, ¶ 8, 19). It is a reasonable inference that Dynavax knew of the relationship between CRN and Plaintiff.

[4]     Dynavax submitted an affidavit by Michael Ostrach, its Vice President, Chief Business Officer, and General Counsel, in which he asserts that "Dynavax has never purposefully availed itself of the privileges or protections of the laws of the state of Illinois." (Doc. 3, Ex. A, ¶ 15). This is in conflict with Plaintiff's evidence and with the Court's finding that Dynavax did purposefully avail itself ot he privileges of doing business in Illinois. As noted above, factual disputes are resolved in the plaintiff's favor.

Clinical Study Agreements, showing that they were contemplated at the time of contracting. (Doc. 1, Exs. 2 & 6). These later contacts with Plaintiff and with Illinois by Dynavax in furtherance the 08 and 09 studies confirm Dynavax's purposeful availment of the benefits of conducting its business in Illinois, according to the very detailed specifications in its protocols.[5] Dynavax was not merely some outside instigator of the studies; it was intimately involved with their conduct and progress throughout the studies, and worked closely with Plaintiff and Plaintiff's representatives.

Further, as noted above, where prior dealings between the parties are related to the instant dispute, contacts with Illinois prior to the contracts initiating the instant dispute can be considered by the Court. *RAR*, 107 F.3d at 1278-79. Here, the Court finds that Dynavax's and SWI's previous dealings related to two prior drug trials are sufficiently related to the instant dispute to be relevant to the personal jurisdiction inquiry in this case: they involved the same drug, and required the same actions by Dynavax and SWI, namely, that SWI perform clinical trials of the drug on patients, and Dynavax was to pay SWI through an intermediary. (Doc. 10, Ex. 1, ¶ 8, 19). These two prior drug trials performed by SWI for Dynavax are "substantively relevant" to the interpretation of the 08 and 09 Clinical Study Agreements and related dealings, as they could be pertinent to showing the

---

[5] The Ostrach affidavit states that "Dynavax had no contacts in the State of Illinois regarding the negotiation and execution of the contracts with are the subject of the claims against it." (Doc. 3, Ex. A, ¶ 17). As discussed in the text, Plaintiff has put on evidence that Dynavax did have contacts in Illinois regarding the negotiation and later execution of the Clinical Study Agreements and their amendments.

contractual terms, industry practice, and the parties' course of dealing relating to payment upon termination of a study.[6]

Considering the Illinois contacts between Dynavax and SWI relating to the DV1-SAR-06 ("06 study") and DV1-SAR-07 ("07 study") studies and the similarities between the parties' dealings, it becomes even more apparent that Dynavax has "purposefully availed" itself of the benefits of having its studies conducted in Illinois on Illinois residents such that the exercise of personal jurisdiction by an Illinois court would not be improper.[7]  In 2004, Dynavax's agent, Quintiles, executed a contract with Dr. Nicholas Nayak of SWI, on behalf of Dynavax, for the performance of the 06 study of the same drug tested in the 08 and 09 trials; Dynavax later sent indemnification to him for his participation in the study.  (Doc. 10, Ex. 1, ¶¶ 10-11, 13, 24).  Dr. Anjuli Nayak negotiated with Quintiles regarding the contract and budget for this study.  (Doc. 10, Ex. 1, ¶ 11).  Also in 2004, Dr. Anjuli Nayak was the principal investigator, at SWI, for another study, 07, of the same drug.  This study was conducted under a Clinical Trial Agreement between Dr. Anjuli Nayak on SWI's behalf and Quintiles on Dynavax's behalf, which was negotiated by Dr.

[6]     It appears from Exhibit 12 to Plaintiff's Complaint that the reason given by Dynavax for its refusal to pay upon SWI's reconciliation calculation was that the Clinical Study Agreements do not contemplate such proration or reapportionment. (Doc. 1, Ex. 12).  While Dynavax has not asserted yet this interpretation in this case (as it has not filed an Answer), it is a reasonable inference that the parties' past contracts and practices would be relevant to determining whether this is a valid interpretation of the contract.

[7]     Through the Ostrach affidavit, Dynavax asserts that "[b]efore the execution of the contracts at issue in this lawsuit, Dynavax had no prior course of dealing or direct contacts with Plaintiff."  (Doc. 3, Ex. A at ¶ 18).  Plaintiff has put on evidence that Dynavax had a prior course of dealing relating to the 06 and 07 studies with SWI, during which it negotiated through its agent with SWI and directly offered indemnification to the prinicipal investigators of the studies.

Nayak; Dynavax agreed to indemnify Dr. Nayak for her work on the study. (Doc. 10, Ex. 1, ¶¶ 14-15). These contacts further show that Dynavax has long purposefully availed itself, through its agent, Quintiles, of the benefits of having its trials for this drug conducted in Illinois by SWI.[8]

Finally, the Court may consider whether it comports with traditional notions of fair play and substantial justice for Dynavax to be subject to personal jurisdiction in Illinois. *Burger King*, 471 U.S. at 476-77. The state of Illinois has a strong interest in protecting Plaintiff in its dealings with Dynavax, and Dynavax cannot be surprised by an Illinois suit relating to the 08 and 09 Clinical Study Agreements where it has purposefully availed itself of the privileges of having four of its studies conducted in Illinois by SWI. The Court finds that Plaintiff has made out a prima facie case for the exercise of personal jurisdiction by this Court over Dynavax, and that the exercise of such jurisdiction does not conflict with Due Process.

---

[8]     Dynavax argues that the choice-of-law provision in the Clinical Study Agreements, specifying California law, should weigh against the exercise of jurisdiction by an Illinois court. (Doc. 1, Ex. 2 at 6; Doc. 1, Ex. 6 at 7). This argument is without merit. Such a choice-of-law provision would be relevant to a California's court's determination that it had jurisdiction over the parties to the Clinical Study Agreements. *Burger King*, 471 U.S. at 481-82. However, it does not indicate that other states cannot exercise jurisdiction over the parties relevant to the contracts. Otherwise, there would never be a need for Illinois courts to perform a choice-of-law analysis where a contract specified the law of another jurisdiction, which is obviously not the case. Illinois courts regularly apply the law of other states to contract disputes where the contract specifies that another state's law is to govern. A choice-of-law clause does not defeat the exercise of personal jurisdiction by this Court, where Dynavax has purposefully availed itself of the privileges of doing business in Illinois.

This contrasts with a forum-selection clause, which will be enforced if it is "freely negotiated" and not "unreasonable and unjust." *Id*. at 473 fn. 14.

## II.     Plaintiff's Standing

Dynavax also, under Rule 12(b)(1), argues that Plaintiff does not have standing to bring this suit against it, as Plaintiff is only an incidental beneficiary of the Clinical Study Agreements between Dynavax and CRN. *American Federation of Government Employees, Local 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir. 1999) ("Obviously, if a plaintiff cannot establish standing to sue, relief from this court is not possible, and dismissal under 12(b)(1) is the appropriate disposition."). "A district court, in ruling upon an issue of subject matter jurisdiction, must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Kelley v. Med-1 Solutions, LLC*, 548 F.3d 600, 604 (7th Cir. 2008) (*citing Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993)).

Plaintiff claims that Dynavax breached the 08 and 09 Clinical Study Agreements with CRN, and that it was an intended third-party beneficiary to those Clinical Study Agreements. Dynavax challenges Plaintiff's standing on the basis of its argument that Plaintiff lacks the ability to enforce the contracts against Dynavax because it is neither a party to those contracts nor an intended third-party beneficiary. The parties agree that California law applies to the interpretation of the contracts, as California law was selected in the contracts' choice-of-law provisions.[9]

---

[9]     In a diversity case, a federal court must apply the choice of law rules of the forum state. *Fulcrum Financial Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1011 (7th Cir. 2000) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, (1941)). "Illinois respects a contract's choice-of-law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy." *Id.*

California's Civil Code provides that "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." CAL. CIV. CODE. § 1559. The parties disagree as to whether the contract between Dynavax and CRN was "made expressly for the benefit" of Plaintiff. In order to determine whether a third party is an intended beneficiary, the Court must determine whether the parties to the contract intended to benefit the third party, "reading the contract as a whole in light of the circumstances under which it was entered." *Hilderman v. Enea TekSci, Inc.*, 551 F.Supp.2d 1183, 1195 (S.D. Cal. 2008) (*quoting Jones v. Aetna Cas. & Surety Co.*, 33 Cal.Rptr.2d 291, 296 (Cal. Ct. App. 1994)).

Dynavax argues that Plaintiff cannot show that it is an intended third party beneficiary, because the purpose of Dynavax and CRN under the contracts was to complete the clinical trials, not to benefit Plaintiff, as is shown by the fact that the contracts do not name Plaintiff. Plaintiff responds that it is part of a class of intended beneficiaries, the members of CRN who would serve as clinical trial sites, which is demonstrated by the fact that the contracts specifically contemplate that CRN would delegate the work of performing the clinical trials to its member sites.

Under California law, a third party need not be named in the contract in order to be an intended beneficiary, but can merely show that it is a "member of a class of persons for whose benefit the contract was made." *Spinks v. Equity Residential Briarwood Apartments*, 90 Cal.Rptr.3d 453, 469 (Cal. App. Ct. 2009)

(*citing Vencor, Inc. v. Webb*, 33 F.3d 840, 844 (7th Cir. 1994); *Keller v. Brunswick Corp.*, 369 N.E.2d 327, 329 (Ill. App. 1977)). There is no indication in this case that the contract is not valid or that California law is contrary to Illinois' fundamental public policy.

(quoting *Garratt v. Baker*, 56 P.2d 225, 226 (Cal. 1936); *citing Soderberg v. McKinney*, 52 Cal.Rptr.2d 635, 644 (Cal. App. Ct. 1996); *Souza v. Westlands Water Dist.*, 38 Cal.Rptr.3d 78, 88)).  Both parties to the contract need not have had such an intent to benefit the third party, so long as the party lacking such intent knew that the other party had such intent.  *Id.* (quoting *Schauer v. Mandarin Gems of California, Inc.*, 23 Cal.Rptr.3d 233, 239 (Cal. Ct. App. 2005); *Lucas v. Hamm*, 364 P.2d 685, 689 (Cal. 1961)).  As noted above, California law provides that the intent of the parties to a contract may be interpreted by looking to the "circumstances under which it was made, and the matter to which it relates."  CAL. CIV. CODE § 1647.

> [I]n determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible."  (*Garcia v. Truck Ins. Exchange*,…682 P.2d 1100, 1105 (Cal. 1984)]; accord, *Souza v. Westlands Water Dist.*,…38 Cal.Rptr.3d 78[, 88 (Cal. Ct. App. 2006)]).  Additionally, a court may consider the subsequent conduct of the parties in construing an ambiguous contract.  (*Southern Cal. Edison Co. v. Superior Court*,…44 Cal.Rptr.2d 227[, 234 (Cal. Ct. App. 1995)]).  In determining intent to benefit a third party, the contracting "parties' practical construction of a contract, as shown by their actions, is important evidence of their intent."  (*Kalmanovitz v. Bitting*,…50 Cal.Rptr.2d 332[, 334 (Cal. Ct. App. 1996)]).

*Spinks*, 90 Cal. Rpt.3d at 469-70.

The Court finds that Plaintiff has sufficiently alleged that it was an intended third-party beneficiary to the contracts between Dynavax and CRN to survive Dynavax's Motion to Dismiss; all Plaintiff's allegations need to show at this point is a reasonable inference that Plaintiff was such an intended beneficiary.  *Kelley*, 548 F.3d at 604.  Plaintiff has at least met this low threshold.

Plaintiff points to the recent California appellate court case of *Spinks v. Equity Residential Briarwood Apartments* to show that it is within the "class of persons for whose benefit the contract was made." 90 Cal.Rptr.3d 453. In *Spinks*, the plaintiff's employer, after executing an employment agreement with her, executed a lease with a landlord to provide housing for the plaintiff during her term of employment. After the employer terminated the plaintiff's employment, the landlord changed the locks on the apartment, effectively evicting her, prior to the agreed lease termination date. The plaintiff sued the landlord, alleging that she was an intended third-party beneficiary of the lease between the landlord and her employer, and that she thus could enforce the lease herself. The trial court granted summary judgment in favor of the landlord, but the appellate court reversed, finding that, under California's law relating to third-party beneficiaries, the plaintiff had produced sufficient evidence that there were genuine issues of material fact for the case to go to trial.

The *Spinks* court noted that "a third party will qualify as an intended beneficiary where 'the circumstances indicate that the promisee' -- here, [the employer] -- 'intends to give the beneficiary the benefit of the promised performance.'" *Id*. at 469 (*quoting* REST. 2D CONTR. § 302(1)(b)). In this case, SWI has alleged sufficient facts to raise the reasonable inference that CRN, which is in the same position as the employer in *Spinks*, intended to give Plaintiff the benefit of the promised performance. The *Spinks* court first found that the "plaintiff arguably was among a class of intended beneficiaries of the lease," as she was a member of the employer's staff when the lease was formed. *Id*. at 473. In the same way, SWI

was a member of CRN, which functioned to obtain and organize sponsored clinical drug trials on behalf of its members, at the time CRN entered into the 08 and 09 Clinical Study Agreements with Dynavax. The leasing company in *Spinks* had been shown to "understand" that employees would live in the apartment, which the court found to support the inference that the plaintiff employee was a member of the intended class; it is a reasonable inference from the allegations that Dynavax knew CRN would contract with its members to perform the trials.[10] Indeed, it appears from the Clinical Study Agreements that Dynavax contracted with CRN *because* CRN had ready access to this group of members. (Doc. 1, Ex. 2 at 1; Doc. 1, Ex. 6 at 1).

Because the *Spinks* court found that the lease's language did not alone resolve the question of whether the plaintiff was an intended third-party beneficiary, it also looked to the circumstances surrounding and following the contract formation, in order to understand the parties' intent. *Id*. at 473. The court identified as a relevant circumstance a "letter of responsibility," signed by the employer's representative on the same day as the lease, that identified the plaintiff by name as the occupant of the apartment; this "raise[d] an inference that plaintiff was an intended beneficiary of the lease." *Id*. Here, the letters from Dynavax to SWI's Dr. Nicholas Nayak offering him indemnification for his participation in the studies under the Clinical Study Agreements also raise a similar inference that SWI

---

[10]     As noted above, *Spinks* was at the summary judgment stage, while the instant case is before the Court on Dynavax's Motions to Dismiss, which is subject to a much lower standard -- a plaintiff at summary judgment must produce evidence showing a genuine issue of material fact, while a plaintiff on a motion to dismiss under Rule 12(b)(2) need only produce allegations that give rise to a reasonable inference that the Court has subject-matter jurisdiction.

was an intended beneficiary of the CRN-Dynavax Clinical Study Agreements; indeed, the indemnification for principal investigators was a requirement of the Clinical Study Agreements. (Doc. 1, Exs. 2, 3, 6, & 9).

Also, the execution of the employment agreement between the *Spinks* plaintiff and the employer was a relevant circumstance. The facts that the employment agreement stated that the employer would provide housing for the plaintiff and that the term of employment overlapped with the term of the lease "tend[ed] to show [the employer's] intent to benefit plaintiff by providing housing for her, procured via this lease." *Id*. at 475. In this case, it is a reasonable inference from the alleged facts and circumstances surrounding CRN's Participation Agreement with SWI that CRN intended to benefit SWI by its agreement with Dynavax. Namely, CRN had a pre-existing agreement with SWI that CRN would act as SWI's agent to market SWI's services and contract with sponsors such as Dynavax. (Doc. 1, Ex. 1).

Finally, the *Spinks* court looked to later events also that raised a genuine issue of material fact as to the plaintiff's status as an intended third-party beneficiary of the lease. Though the facts' possible interpretations were "in conflict," they were sufficient to show that the plaintiff's case should have survived summary judgment. *Id*. at 474-75. Here, Dr. Anjuli Nayak, one of the principal investigators at SWI, participated in several components of budget creation and contract negotiation after the execution of each of the Clinical Study Agreements. (Doc. 1 at 3-4, 6). Further, the detailed protocols for both studies were sent to SWI by Dynavax, and auditors visited SWI's location during the studies on behalf of

Dynavax. (Doc. 1 at 3, 5; Doc. 10 at E. 1, ¶¶ 21 & 22). It is a reasonable inference that these facts indicate that CRN intended to benefit SWI by the Clinical Study Agreements, and that Dynavax was aware of this intention.

As the foregoing discussion shows, SWI has alleged sufficient facts to raise the reasonable inference that it was an intended third-party beneficiary to the contracts between CRN and Dynavax under California law. Dynavax attempts to distinguish *Spinks* by pointing out that the court there relied "heavily" on the Restatement (Second) of Contracts § 302, and that the Restatement contains examples that appear to oppose SWI's position.[11] (Doc. 13 at 3). First, and most importantly, the Court notes that it is California law, not the Restatement, that is controlling in this case. The fact that a California court relied in part on the Restatement does not mean that the Restatement supersedes California courts' declaration and application of the law of their state. The *Spinks* case has significant factual parallels to the instant scenario that make it instructive as to the application of California law to this case, and makes clear that factual circumstances not included in a simple Restatement example are considered highly relevant to determining whether a third party is an intended beneficiary of a contract.

---

[11]    The Court would not characterize *Spinks'* reliance on the Restatement as "heavy," as the court relied to a much greater extent on California case law throughout the opinion. Indeed, the Restatement is cited only twice, once for the general proposition that "An incidental beneficiary is a beneficiary who is not an intended beneficiary," and once for the statement that "a third party will qualify as an intended beneficiary where 'the circumstances indicate that the promisee' -- here, Mobile -- 'intends to give the beneficiary the benefit of the promised performance.'" *Spinks*, 90 Cal.Rptr. at 468, 469.

Further, the example from § 302 of the Restatement, which Dynavax cites as defeating Plaintiff's case, is inapposite to the "class of beneficiaries" analysis discussed in *Spinks* and relied on by Plaintiff in this case. This example, number 19, states that "A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building." REST. 2D CONTR. § 302. There is no indication in this example that A had in mind a specific group of suppliers from which it would buy when it contracted with C, or that C knew of the existence of this group. In addition, the contract between A and C did not specifically direct A to form contracts with suppliers from a set group as part of its performance. Further, there are no facts and circumstances showing the intentions of the A and C given in this example, which the *Spinks* court relied on in interpreting the contract.

Dynavax also cites to *Southern California Acoustics Co. v. C.V. Holder, Inc.* 456 P.2d 975, 982 (1969). In that case, a subcontractor brought a breach of contract action based on a contract between the general contractor and the school district. The general contractor had included the name of the subcontractor in the contract because a statute required a listing of the names of all subcontractors. The plaintiff subcontractor argued to the court that its being named in the contract bid showed that it was a third-party beneficiary. The court rejected this argument, finding that the "[p]laintiff was listed in response to statutory command and not because the

contracting parties' purpose was expressly to benefit it."[12]  *Id.* at 982.  Dynavax

cited this case for the proposition that, even where a subcontractor is expressly

named in the contract, it is not an intended beneficiary.  Plaintiff distinguished the

case on the ground that the subcontractor was only named because of the statute,

not because the parties to the contract intended to benefit it.  The Court finds

Plaintiff's reading of the case to be more accurate -- the *Southern California*

*Acoustics* court itself based its finding that the parties did not intend to benefit the

subcontractor on the fact that the listing of the subcontractor was only motivated by

the statute.  *Id.*  The naming *alone* did not indicate intended third-party beneficiary

status where there was *no other indication* of the parties' intent, but this does not

show that an unnamed third party could never be an intended third-party

beneficiary, where there is sufficient evidence to raise an inference of such intent,

as in *Spinks*.[13]

---

[12]    Indeed, the court had held that the general contractor had never even accepted the subcontractor's bid for work on the project; the fact that the general contractor had listed the subcontractor on the bid did not indicate acceptance of the subcontractor's offer.  *Southern California Acoustics Co.*, 456 P.2d at 978.  If the general contractor did not accept the subcontractor's bid, it could not have intended for the subcontractor to be a third-party beneficiary.

[13]    Defendant also cites *Subaru Distributors Corp. v. Subaru of America, Inc.*, a Second Circuit case applying New York law.  425 F.3d 119 (2nd Cir. 2005).  In *Subaru Distributors*, the Second Circuit held that New York law did not find sub-distributors to be intended beneficiaries of a contract between a manufacturer and a distributor merely because the contract required the distributor to appoint sub-distributors in order to assist it in its performance.  *Id.* at 125 (*citing Artwear, Inc. v. Hughes*, 615 N.Y.S.2d 689, 691-94 (N.Y. App. Div. 1994)).  This language alone would not support the determination that the sub-distributor was an intended beneficiary under New York law.

The Court does not here find it necessary to deal extensively with this case, as it applies New York, not California law.  Even if the relevant law of these two states is similar, as there are California cases on point, there is no need for analysis

Because this Court has personal jurisdiction over Dynavax and because Plaintiff has standing to sue Dynavax for breach of contract, Dynavax's Motion to Dismiss Counts I and II of Plaintiff's Complaint is denied.

## CRN'S MOTION TO DISMISS

CRN moves to dismiss Counts III and IV of Plaintiff's Complaint under Rule 12(b)(6), arguing that these Counts against it fail to state a claim upon which relief can be granted. In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must view a complaint in a light most favorable to the plaintiff. *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 763 (7th Cir. 2010) (*citing Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir.2008)). "The complaint must contain 'enough facts to state a claim to relief that is plausible on its face,'" which means that the court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bissessur v. Indiana University Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009) (*quoting Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Tamayo*, 526 F.3d at 1084). The plaintiff is given "the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Id.* at 603 (*quoting Sanjuan v. Amer. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)).

---

of other jurisdictions' approaches. Further, *Subaru Distributors* does not state that the sub-distributor could never be an intended beneficiary, just that it was not one in that case. Indeed, the court discussed other potential "surrounding circumstances" purported to show an intent to benefit the sub-distributor, but rejected them, in that case, as insufficient; they were nowhere near as strong as those alleged in this case. *Id*. at 126. Here, a California court has held that circumstances similar to those of the instant case were enough to survive summary judgment; *Subaru Distributors* does not undermine the applicability of *Spinks*.

In its Motion to Dismiss, CRN argues that the terms of the 2005 and 2006 agreements between CRN and SWI set up only a "pass through" arrangement requiring that CRN pass on compensation received from Dynavax; as Plaintiff does not allege that CRN received any funds from Dynavax that it failed to pass on to SWI according to the contracts, SWI has failed to state a claim upon which relief can be granted.[14]  In addition, CRN argues that the Participation Agreement between itself and SWI explicitly provides that CRN is not obligated to pay SWI if it does not receive payment from the study sponsor, here, Dynavax.

SWI counters that the 2005 and 2006 agreements set up a "pay when paid" arrangement, which courts have interpreted as inherently ambiguous and only setting up a timetable for payment by the go-between, not creating as a condition on payment that the go-between have received payment; CRN had a duty to pay SWI whether or not it received payment from Dynavax.  SWI responds to the argument that the Participation Agreement relieves CRN of the duty to pay when it has not been paid by Dynavax by noting the supremacy clause in the 2005 and 2006 agreements, which provides that the later agreements prevail over conflicting terms in the Participation Agreement.  Both parties appear to agree that Missouri law governs the interpretation of these contracts, as the Participation Agreement specifies Missouri law, and the 2005 and 2006 agreements, which do not contain a

---

[14]     CRN refers to these agreements as the Clinical Study Agreements, which is accurate, since that is the title they each bear.  However, the Court will refer to them as the 2005 and 2006 agreements, as the term "Clinical Study Agreement" is also used to refer to the agreements between CRN and Dynavax.

The 2005 and 2006 agreements' language appears to be identical.

choice-of-law provision, "affirm the Participation Agreement."[15] (Doc. 5 at 4; Doc. 11 at 7). The Court will therefore apply Missouri law to the interpretation of these contracts.

Plaintiff's Complaint alleges that CRN breached the 2005 and 2006 agreements between itself and SWI. (Doc. 1 at 10-11). The 2005 and 2006 agreements both state that "CRN…will pay the Site and its associated principal investigator(s) as CRN receives payments from Sponsor," and that "[i]n the event any provision of this Agreement conflicts with a provision in the Participation Agreement, the provisions in this Agreement shall prevail." (Doc. 1, Ex. 4 at 1; Doc. 1, Ex. 7 at 1). The Participation Agreement, executed by CRN and SWI on January 13, 2003,[16] states that "[i]f a Study Sponsor fails for any reason to provide

_____

[15]     The quotation is taken from CRN's brief. SWI does not address the choice-of-law issue explicitly, but cites primarily to Missouri law in its argument. The Court therefore assumes that the parties are in agreement as to the applicability of Missouri law to each of these agreements.

         As noted above, this Court must apply the choice-of-law rules of Illinois in this case, and Illinois generally respects the parties' choice of law in a contract. *Fulcrum Financial Partners*, 230 F.3d at 1011. Again, there is no indication that these contracts are invalid, or that the application of Missouri law will violate a fundamental public policy of Illinois.

[16]     This document, which is attached to Plaintiff's Complaint as Exhibit 1, does not state the year of the contract, nor does it bear signatures by CRN's representatives. (Doc. 1, Ex. 1). Plaintiff has alleged the date of the contract as January 13, 2003, and CRN does not take issue with this allegation. (Doc. 1 at 2). In addition, CRN acknowledges the Participation Agreement as properly executed and controlling between the parties, citing to the version attached to Plaintiff's Complaint, and relying on it for the argument that CRN is relieved by it of a duty to pay Plaintiff when Dynavax has not paid CRN. (Doc. 5 at 2-3). As this matter is before the Court on a Rule 12(b)(6) motion, which does not require evidentiary proof, the Court will accept both of these omissions. The parties are instructed, however, that they will need to provide either a stipulation of these facts (the date and proper execution) or a copy of the contract that contains the needed date and signatures if this case reaches a stage where evidence is required.

compensation to CRN, CRN shall not be obligated to compensate PARTICIPANT under the corresponding Approved Agreement." (Doc. 1, Ex. 1 at 3). It also provides that CRN is SWI's agent for "billing and collecting from a Study Sponsor for Study Services provided by PARTICIPANT pursuant to Approved Agreements," and that SWI "shall accept from CRN, as payment in full for Study Services, an amount specified for such Study Services in the applicable Approved Agreement." (Doc. 1, Ex. 1 at 2-3).

As noted by SWI in its Response, the language of the 2005 and 2006 agreements noting that "CRN...will pay the Site and its associated principal investigator(s) as CRN receives payments from Sponsor," is sometimes known as a "pay when paid" or "pay if paid" clause. In *American Drilling Service Co. v. City of Springfield*, the Missouri Court of Appeals adopted the majority rule that "[a] clause which provides that the contractor shall pay a subcontractor within a stated number of days after the contractor has received payment from the owner merely fixes the time when payment is due and does not establish a condition precedent to payment." 614 S.W.2d 266, 273 (Mo. App. 1981) (collecting cases). In *MECO Systems, Inc. v. Dancing Bear Entertainment, Inc.*, the Missouri Court of Appeals affirmed this rule, and the rule that "if a 'pay if paid' provision is clear and unambiguous, it will be interpreted as setting a condition precedent to the general contractor's obligation to pay. Conversely, if such a provision is ambiguous, it will be interpreted as fixing a reasonable time for the general contractor to pay." 42 S.W.3d 794, 806 (Mo. App. 2001) (*citing American Drilling*, 614 S.W.2d 266)). The *MECO* court noted that *American Drilling* implicitly recognized the general rule

that "the law does not favor conditions precedent, and courts will only construe contract provisions to be such when required to do so by plain and unambiguous language." *Id.* at 806 fn. 4 (*citing Kansas City Southern Ry. Co. v. St. Louis-S.F.Ry. Co.*, 509 S.W.2d 457, 460 (Mo. 1974); *Juengel Const. Co., Inc. v. Mt. Etna, Inc.*, 622 S.W.2d 510, 513-14 (Mo. App.1981)).

The Court finds that, given the adoption by the Missouri courts of this rule regarding the interpretation of "pay when paid" clauses, the "pay when paid" clause of the 2005 and 2006 agreements is ambiguous. The language of the 2005 and 2006 agreements stating that "CRN…will pay the Site and its associated principal investigator(s) as CRN receives payments from Sponsor," is no more "plain and unambiguous" a statement of a condition precedent than that in the *American Drilling* case.[17] It does not appear that a Missouri court has explained what would constitute "plain and unambiguous language" denoting a condition precedent, but, drawing all reasonable inferences in Plaintiff's favor, this is not it, especially in light of the disfavor with which Missouri courts view conditions precedent.

If a contract is ambiguous, it cannot be interpreted by a court as a matter of law without some presentation of extrinsic evidence. *Maritz Holdings, Inc. v. Federal Ins. Co.*, 298 S.W.3d 92, 101 (Mo.App. 2009). In this case, the Court cannot determine from the record, as a matter of law, that the "pay when paid" language of the 2005 and 2006 agreements necessarily sets only a "reasonable time" for payment, which is SWI's preferred interpretation. It is possible that extrinsic

---

[17] The contract in *American Drilling* provided that "partial payments [from contractor] shall not become due to [subcontractor] until ten days after [contractor] receives payment for such work from [the owner]." 614 S.W.2d at 271-72 n. 7.

evidence will show that the parties in fact intended for payment be Dynavax to be a condition precedent on CRN's duty to pay SWI. In addition, though it might be argued at a later point that any ambiguity in the 2005 and 2006 agreements' "CRN…will pay [SWI] as CRN receives payments" language is clarified, rather than contradicted, by the clause in the Participation Agreement purporting to relieve CRN of liability to SWI if Dynavax does not pay, such an argument is premature now, given both the supremacy clause in the 2005 and 2006 agreements and the rule that all reasonable inferences must be made in Plaintiff's favor in ruling on a Rule 12(b)(6) motion.

Missouri law generally interprets language such as that found in the 2005 and 2006 agreements, that "CRN…will pay [SWI] as CRN receives payments," as ambiguous, absent language that clearly requires that such payment to CRN is a condition precedent. In this case, such language is absent, and so the clause does not, as a matter of law, set up payment to CRN as a condition precedent to CRN paying SWI. As the contracts' meaning when read together is ambiguous, extrinsic evidence must be evaluated to determine the parties' intent; dismissal of the action for failure to state a claim based on CRN's interpretation of an ambiguous clause is inappropriate. Therefore, drawing all reasonable inferences from the allegations in SWI's favor, SWI has sufficiently stated a claim to withstand CRN's Motion to Dismiss.

**CONCLUSION**

For the foregoing reasons, Dynavax's Motion to Dismiss (Doc. 3) is DENIED, and CRN's Motion to Dismiss (Doc. 5) is DENIED. This matter is referred to Magistrate Judge Gorman for further pretrial proceedings.

IT IS SO ORDERED.

Entered this <u>15th</u> day of March, 2010.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
